Commonwealth ex rel. Wilson, Appellant, *v.* Rundle.

Submitted April 18, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Raymond P. Wilson,* appellant, in propria persona.

*Burton Satzberg* and *Arlen Specter,* Assistant District Attorneys, *F. Emmett Fitzpatrick, Jr.,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, October 9, 1963:

Raymond P. Wilson—now serving a life sentence after conviction of a felony murder[1]—filed in the Court of Common Pleas of Philadelphia County a habeas corpus petition which that court dismissed without a hearing.

On this appeal, at the outset, Wilson claims that he was entitled to a hearing on his petition and an opportunity to present allegedly material facts in support thereof and that the court's refusal of his petition without a hearing constitutes error. In a habeas corpus proceeding, where no material or substantial questions of fact are involved and where the questions presented are questions of law, no hearing for the taking of testimony is necessary: *Commonwealth ex rel. Davis v. Banmiller*, 192 Pa. Superior Ct. 130, 159 A. 2d 770. See: *Commonwealth ex rel. Dickerson v. Rundle*, 411 Pa. 651, 192 A. 2d 347; *Commonwealth ex rel. Butler v. Rundle*, 407 Pa. 535, 180 A. 2d 923.

In his petition, Wilson raises, in substance, four questions: (a) that a Commonwealth witness at Wilson's trial has repudiated his testimony; (b) that at trial the district attorney made a prejudicial misstatement to the jury; (c) that certain hearsay evidence was admitted at the trial; (d) that certain evidence received at the trial—United States currency—was obtained through an unreasonable search and seizure and, therefore, under *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, such evidence should have been excluded. Since the Commonwealth *concedes the fact* that the Commonwealth witness Nixon has now repudiated his testimony, question (a) presents no issue of fact; since the Commonwealth *admits* both the making, and the inaccuracy, of the district attorney's statement, likewise, question (b) raises no question of fact; question (c) is patently a question of law; if *Mapp*, supra, is

[1] See: *Commonwealth v. Wilson*, 394 Pa. 588, 148 A. 2d 234, cert. den. 361 U.S. 844, 80 S. Ct. 97.

inapplicable to the case at bar—that being purely a legal question—, question (d) raises no issue of fact. Under these circumstances, Wilson was not entitled to a hearing on his petition and the court below correctly so held.

We accept as an established fact Wilson's averment that the Commonwealth witness Nixon has now repudiated his trial testimony. At trial Nixon testified as to certain admissions, allegedly, made to him by Wilson concerning the murder while Wilson and Nixon were cellmates in a Las Vegas jail. In corroboration of this testimony, the court admitted into evidence certain consonant statements, allegedly, made by Nixon to federal investigators as well as evidence that Nixon displayed to a federal agent a $400 money order which, allegedly, Wilson had procured from Mrs. Ellsworth, wife of one of Wilson's co-conspirators, and which was given to Nixon to secure bail so that, on his release, Nixon could go to Florida and arrange an alibi defense for Wilson in connection with the crime for which Wilson was then held. Wilson now contends that "the trial court permitted the admission [into evidence] of deliberately fabricated testimony" of Nixon. As background for the evaluation of this charge, we refer to that which we said in *Commonwealth v. Wilson*, supra (pp. 604, 605) : "The trial judge stated: *'If the guilt or innocence of [Wilson] were to be determined alone upon the uncorroborated testimony of [Nixon] I should be directing you [the jury] to return a verdict of not guilty.'* It is hard to envisage a more fair, outspoken and favorable comment for the defense than this expression of the trial judge's opinion concerning Nixon's testimony. Furthermore, the trial court told the jury that Nixon was a 'convicted felon, presently serving a sentence in a Georgia Prison,' that the examination 'has brought out a number of offenses for which he was convicted and the

number of escapes from prisons and penitentiaries. All in all, it is the story of one whose life has been badly misspent.' Nixon's testimony was characterized by the trial judge as 'tainted, corrupt and entitled to little weight' and the jury was warned to scrutinize such testimony 'with the greatest care.' " In addition, the trial judge warned the jury that acceptance of Nixon's testimony " ' would depend on what corroborative evidence the jury might find.' "

From an examination of the trial record, it is clear beyond question that the trial court portrayed Nixon to the jury in the worst possible light and that the jury was informed of Nixon's bad character, his testimonial unreliability and past misdeeds. Under such circumstances, Wilson's rights, in connection with Nixon's testimony, were fully protected. Even without Nixon's evidence, Wilson's guilt was thoroughly established by other evidence.

In *Commonwealth v. Palarino,* 168 Pa. Superior Ct. 152, 155, 77 A. 2d 665, the Court said: "As to recantation, this Court has said: 'We cannot interfere in this matter unless there is a plain abuse of discretion. In 16 C.J., page 1188, section 2715, the law generally upon this subject is stated that "recanting testimony is exceedingly unreliable and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Especially . . . is this true where the recantation involves a confession of perjury. . . ." There is no form of proof so unreliable as recanting testimony. [citing cases].' " *Commonwealth v. Ruff,* 92 Pa. Superior Ct. 530, 535, 536. An appellate court will not interfere with an order refusing a new trial on the ground of recantation in the absence of a showing of a plain abuse of discretion: *Commonwealth v. Saunders,* 386 Pa. 149, 155, 125 A. 2d 442; *Commonwealth v. Scull,* 200 Pa. Superior Ct. 122, 130, 186 A. 2d 854. On the state of this record the court below did

not abuse its discretion. Every rational inference militates against granting any credence to Nixon's present repudiation of his testimony, the more so in that Wilson alleges nothing in his petition to support the credibility of the repudiation that was not made known in strong terms by the trial court to the jury at trial.

Moreover, a contention that perjured testimony was presented at trial is not a subject of habeas corpus: *Commonwealth ex rel. Leeper v. Russell,* 199 Pa. Superior Ct. 93, 184 A. 2d 149.

Wilson next contends he was denied due process by reason of a false statement made by the district attorney in his opening statement to the jury to the effect that Wilson "allegedly conspired with three co-defendants, [Ellsworth], [DeMoss] and [Thomas], to rob and murder Lulubel Rossman, on the false theory the alleged conspiracy emanated through an arrest of defendants Wilson and Ellsworth in Oklahoma by Thomas and DeMoss, who were then Tulsa police officers."[2] In his opening remarks, the district attorney stated that he would show that "Mr. Thomas and Mr. DeMoss had apprehended Mr. Wilson and Mr. Ellsworth and sent them both to jail for *robbery* in Oklahoma". The facts as presented did not so prove. As the evidence developed, it appeared that DeMoss and Thomas had arrested Wilson as a result of which Wilson was convicted and sentenced to a two year term for *burglary* but that, when Ellsworth was arrested and convicted of burglary in Oklahoma, *only DeMoss* could have been aware of that fact since by that time Thomas had left the Tulsa police force. The district attorney corrected this misstatement, he did not repeat it and, in further assurance that the jury was not misled, the following excerpt from the record is to be noted: "THE COURT: ... You [the jury] will recall that the Commonwealth in

[2] This is Wilson's version of the false statement.

its opening address told you that it would offer evidence to prove that [Wilson] has suffered a conviction for robbery. The Commonwealth later corrected that to mean burglary and not robbery. The Commonwealth has offered evidence of the conviction of [Wilson] for burglary in the second degree. It has produced the testimony of the former county attorney of Payne County . . . to the effect that he prosecuted the case, that the arresting officers were [DeMoss] and [Thomas], that [Wilson] was the man now on trial and that he was convicted of the crime of robbery and that he was sentenced for a term of two years. MR. BLANC [District Attorney] : If your Honor please, you used the term robbery. You made the same mistake I did. THE COURT: I mean burglary. You are hereby instructed that this conviction cannot and must not be considered by you as bearing on the question of [Wilson's] guilt."

The jury could not have been misled by the district attorney's opening statement. The evidence proved that Wilson had been arrested by two of his alleged co-conspirators and that, as a result of that arrest, he was convicted and received a jail sentence and the so-called "misstatement" was at least *substantially* true as to Wilson, Thomas and DeMoss. Wilson can hardly complain that it was not true as to Ellsworth. We find no merit in this contention.[3]

Wilson next urges that the trial court committed fundamental error in permitting the reception into evi-

[3] The following excerpt from Jim the Penman's Trial (Wigmore, Evidence, 3rd Ed., Vol. VI, §1807 (1)) illustrates the issue. There, the prisoner protests the truth of an allegation in the prosecutor's opening statement: " 'But, my Lord, the evidence may not be true.' The CHIEF BARON [POLLOCK]. 'But we must hear it before we can judge whether it be true or false; and before we can receive the evidence we must hear the [counsel's] narrative of the whole transaction.' "

dence of certain hearsay evidence relating to an admonition by Wilson's alleged co-conspirator, Thomas, to the murder victim not to leave her room on the day of the murder. In *Commonwealth v. Wilson*, supra, pp. 597, 601, we fully considered this argument and we concluded then and we again conclude that such testimony had been properly admitted as a well-established exception to the hearsay rule. In any event, such contention is not properly before us on habeas corpus since it is repetitious of that which was raised in previous proceedings in this matter: *Commonwealth ex rel. Dickerson v. Rundle*, 411 Pa. 651, 192 A. 2d 347.

Lastly, in reliance on *Mapp v. Ohio*, supra, Wilson contends that the admission into evidence at his trial of certain $100 bills in U. S. currency and their serial numbers, seized from his person and hotel room in Las Vegas without a search warrant, constituted a violation of his constitutional rights.

After conviction and judgment of sentence, Wilson appealed to this Court. Both at trial and on appeal, Wilson raised, inter alia, the question of the admissibility into evidence of testimony as to the concatenation through serial numbers of certain U. S. currency, some of which was found on his person and in his hotel room, but he did not raise any question as to the legality of the search and seizure which led to the finding and the production of such currency. Wilson's judgment of sentence became final long prior to the decision of the U. S. Supreme Court in *Mapp*. It is our present duty to determine whether *Mapp* must be applied *retrospectively* to the case at bar.

Whether the *Mapp* rule is to be applied retrospectively and, if so, to what extent, the majority opinion in *Mapp* does not disclose. In large measure, therefore, in determining the impact of *Mapp* we must consider its basic purpose.

The Court *could have* held that *Mapp's* rule of exclusion of evidence obtained through an unreasonable

search and seizure would apply only *prospectively,* even as to Miss Mapp, especially since, as Mr. Justice HARLAN in dissent noted, the rule of exclusion was not the principal issue decided by the state court, nor was it "tendered by [Miss Mapp's] Jurisdictional Statement" nor briefed or argued by Miss Mapp's counsel before the Supreme Court. However, since it did apply the rule of exclusion to Miss Mapp's trial, to that extent the Court did apply *Mapp* retrospectively.

Having applied the rule to Miss Mapp, it would seem only essentially fair and logical that the rule be applied retrospectively in two other situations: (a) to *all* cases where the allegedly unconstitutional search and seizure took place *prior* to *Mapp* but the motion to suppress the evidence was not made or the trial did not take place until *after Mapp* (*Ker v. California,* 374 U.S. 23, 83 S. Ct. 1623; *Commonwealth v. Cockfield,* 411 Pa. 71, footnote p. 74, 190 A. 2d 898); (b) to *all* cases where not only the search and seizure took place *prior* to *Mapp* but where the conviction and the judgment of sentence had not become final[4] at the time *Mapp* was decided (*People v. Loria,* 10 N.Y. 2d 368, 179 N.E. 2d 478; *People v. O'Neill,* 11 N.Y. 2d 148, 182 N.E. 2d 95; *State v. Smith,* 37 N.J. 481, 181 A. 2d 761; *State v. Valentin,* 36 N.J. 41, 174 A. 2d 737; *Commonwealth v. Spofford,* 343 Mass. 703, 180 N.E. 2d 673).

A third situation—illustrated by the case at bar— is where the conviction and judgment of sentence became final *prior* to *Mapp* and *after Mapp* the conviction and judgment of sentence are collaterally attacked through habeas corpus in a state court.[5] In

---

[4] "Final" in the sense that the time for perfecting an appeal to the state appellate court had not expired or that an appeal had been taken but not determined or that the time for seeking a review by the U. S. Supreme Court had not expired or that a review by that Court was pending.

[5] Or in a federal court, under the federal practice by a motion for relief under 28 U.S.C.A. §2255.

considering *Mapp's* applicability to this situation, it is essential that we bear in mind what the U. S. Supreme Court said in 1949 in *Wolf v. Colorado*, 338 U.S. 25, 69 S. Ct. 1359, 1364: "We hold, therefore, that *in a prosecution in a State court for a State crime the Fourteenth Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure.*" (Emphasis supplied). In this third situation, the courts in a vast majority of the states, including Pennsylvania, in reliance upon *Wolf*, in criminal trials followed the non-exclusionary rule which, as *Wolf* clearly indicated, was not then constitutionally inhibited. All parties to Wilson's trial, as in most pre-*Mapp* trials, placed full reliance on *Wolf* and such reliance certainly militates against a construction of the effect of *Mapp* which would set aside a trial conducted in full compliance with that which was, at the time, the law of the land.

In analyzing the applicability of *Mapp* to this third situation, we must understand the basic purpose behind the mandate of the Court in *Mapp*. In *Elkins v. U.S.*, 364 U.S. 206, 217, 80 S. Ct. 1444, referring to the "basic postulate" of the exclusionary rule, Mr. Justice STEWART said: "The rule is calculated to *prevent*, not to *repair*. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." (Emphasis supplied) The efficacy of this exclusionary rule in support of the constitutional right lies in the sanction which it imposes; if police officials, in conducting searches and seizures, do so in a constitutionally illegal manner, their official lawlessness is penalized by the refusal of the court to permit the evidence obtained from, or the "fruits of", such illegally conducted searches and seizures to be used against the prisoner.

In *Weeks v. U. S.*, 232 U.S. 383, 34 S. Ct. 341, 344, as *Mapp* notes, the Court stated that the Fourth

Amendment "forever secure[d] the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law" and that the duty of enforcement of that right lay with those entrusted with the enforcement of law under the Federal system. In *Wolf*, supra, 69 S. Ct. at p. 1361, the Court, recognizing that the "security of one's privacy against arbitrary intrusion by the police . . . is basic to a free society" and that such right is enforceable against the states through the due process clause, hesitated to treat the remedy of exclusion of illegally obtained evidence as the *only vital method* for the protection of that right and considered that the right to privacy had methods of protection other than the exclusion of evidence which "may be an effective way of deterring unreasonable searches" and the Court in *Wolf* refused to condemn, as falling below the minimal standards assured by the due process clause, a State reliance upon other methods (such as "the remedies of private action" and "such protection, as the internal discipline of the police, under the eyes of an alert public opinion, may afford") "which, if consistently enforced, would be equally effective."[6] In *Mapp*, 81 S. Ct. at p. 1688, referring to the exclusionary rule as a rule of evidence which is of constitutional origin, the Court recognized the "obvious *futility* of relegating the Fourth Amendment to the protection of" remedies other than the exclusionary rule.

It seems clear beyond any question that, in *Mapp*, the Court, "took the bull by the horns" and concluded that the exclusionary rule offered the *only* practical and effective method for the enforcement of the Fourth

---

[6] In supporting its application of the exclusionary rule against federal and not state police officials, the Court distinguished between federal and state police officials on the ground that the local public opinion could be more effectively exerted against oppressive conduct by the latter than by the former.

Amendment right, other state methods and remedies by way of sanction having failed to afford that measure of protection, intended by the Constitution, to the individual whose rights under the Fourth Amendment had been breached. In our view, had the sanction afforded by the states *effectively* vindicated the constitutional right, the *Mapp* rule would have been unnecessary.[7]

This rule of exclusion is essentially a rule of evidence, even though of constitutional dimensions. In excluding illegally obtained evidence, the purpose is not to exclude such evidence because it is testimonially untrustworthy or lacking in reliability but to discourage police officials from conduct in violation of the Constitution. As Chief Justice WEINTRAUB said in *State v. Smith,* supra, 181 A. 2d pp. 762, 763: "Nor is it a decisive difference [in solving the problem of the retroactive application of decisional law in criminal matters] that Mapp deals with a constitutional guaranty rather than a principle of lesser stature. . . . We are not dealing with a denial of a right which bears upon the truth of a conviction, as for example, the right to counsel or to appellate review. [citing cases]. Rather the subject is evidence, the probative force of which is constant whether it is seized with or without warrant. The heroin was heroin, and defendant's connection with it was the same, with or without official compliance with the law of search and seizure. In short, the fairness of the trial itself and the truth of the verdict are not involved. The constitutional injury lies elsewhere. . . ." "This purpose of the new rule to deter police,

---

[7] As expressed in *People v. Eastman,* 33 Misc. 2d 583, 228 N.Y.S. 156, 161, 162, ". . . Mapp was designed to control State police conduct. The sanctions mentioned by the Wolf court—civil suits, criminal or administrative proceedings against the police officer, Federal civil rights proceedings—had proved ineffective. Mapp imposed the only sanction theretofore proven effective, the exclusionary rule."

which seems from the Mapp opinion to be its main purpose, is not meaningfully served by the general application of the rule to past trials. The purpose of deterrence is a particularly prospective purpose. The only police conduct which can now be deterred is future conduct. It is unlikely that sudden reexamination of a great number of old trials would increase the future obedience of state police to constitutional rules:" Bender, The Retroactive Effect of an Overruling Constitutional Decision:[8] Mapp v. Ohio, 110 U. of Pa. L. Rev. 650, 661.

The federal courts do not agree as to the extent to which *Mapp* is retrospective. In *Gaitan v. U.S.*, 295 F. 2d 277, cert. den. 369 U.S. 857, 82 S. Ct. 939, the Court held that, even though evidence admitted at the trial would not be admissible under *Mapp,* a change in the rule thereafter did not arrest or suspend application of the principle of res adjudicata to the conviction and sentence. See also: *McLester v. U.S.*, 306 F. 2d 880. Contra: *Hall v. Warden,* 313 F. 2d 483, cer. den. 368 U.S. 867, 82 S. Ct. 78; *Walker v. Peppersack,* 316 F. 2d 119. See also: *People v. Kelly,* 12 N.Y. 2d 248, 189 N.E. 2d 477; *United States ex rel. Linkletter v. Walker* (C.A. 5), 323 F. 2d 11. In *Pearson v. U.S.*, 305 F. 2d 34, the Court said: "Claims that evidence obtained by illegal search and seizure was improperly introduced at the trial do not present a cognizable issue in a §2255 proceeding [a collateral proceeding]", the theory being that §2255 "does not provide a method to try over again cases in which defendants have been adjudged guilty"

---

[8] As expressed in *State v. Smith,* supra, p. 763: "If this be so [that the exclusionary rule of *Mapp* is a deterrent against future official lawlessness], Mapp should apply only to subsequent searches, since what has happened is beyond deterrence. True, retroactive application would make the holding of Mapp all the more emphatic, but the State says such emphasis, being unnecessary, would be punitive to society and a windfall to the guilty."

and collateral attack is not a substitute for an appeal. *Pearson* was approved in *Thomas v. U. S.*, 308 F. 2d 369, and *Warren v. U.S.*, 311 F. 2d 673.

In our opinion, *Mapp* was never intended to apply in retrospection so as to command the reversal of judgments of sentence and convictions which *now* offend the *Mapp* rule but which became final *prior to Mapp*. Bearing in mind the basic purpose of *Mapp*—the deterrence of future unlawful police conduct—and that the rule of exclusion is not aimed at any trial unfairness but at official lawlessness, we take the position that *Mapp* should not be applied to a situation such as herein presented and that it was not the intent of the Supreme Court that *Mapp* apply retrospectively to convictions and judgments of sentence which became final *prior to Mapp*. The Superior Court of this Commonwealth has taken the same position: *Commonwealth ex rel. Stoner v. Myers*, 199 Pa. Superior Ct. 341, 346, 185 A. 2d 806, wherein the Court said: ". . . it is the considered opinion of the judges of this Court that convictions which have been unappealed and have become final should not ordinarily be subject to collateral attack by habeas corpus on the ground that evidence alleged to have been illegally received was used at the trial."

Since, in our opinion, *Mapp* is inapplicable to the instant situation, we need not pass upon the reasonable nature of the search and seizure herein. In fact, if we were to do so, we would have to remand the matter to the court below because neither Commonwealth nor defense counsel had an opportunity at trial to fully develop this phase of the matter.

Order affirmed.

Mr. Justice COHEN dissents.