Commonwealth ex rel. Hilberry, Appellant, *v.* Maroney.

Submitted October 5, 1966. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

494

[REDACTED]

*William Thomas Hilberry,* appellant, in propria persona.

*Kenneth E. Fox, Jr.,* District Attorney, for appellee.

OPINION BY MR. JUSTICE EAGEN, March 14, 1967:

On September 5, 1952, William Thomas Hilberry plead guilty generally to murder in Lawrence County. A hearing before the court was held on October 8 and 9, 1952, and subsequently he was adjudged guilty of murder in the first degree and sentenced to life imprisonment. In 1965, in habeas corpus proceedings, Hilberry challenged the validity of his conviction and sentence, alleging that at the time thereof he was mentally incompetent and unable to comprehend his acts. The question presented by this appeal is, whether or not the court below correctly dismissed the proceedings and properly found, after hearing, that Hilberry's allegations of incompetency at the times involved were without merit.[1]

There can be no doubt that, if Hilberry were mentally incompetent at the time he entered his plea, the

---

[1] The trial court originally dismissed the proceedings without hearing. We vacated this order and remanded the case for hearing and a determination of the facts involved in the important constitutional questions raised. See 417 Pa. 534, 207 A. 2d 794 (1965). A new appeal from the latest order dismissing the action is now before us.

same should be set aside and declared of no effect. See *Commonwealth v. Moon,* 383 Pa. 18, 117 A. 2d 96 (1955). And the test to be applied in determining the legal sufficiency of his mental capacity to stand trial, or enter a plea at the time involved, is not the M'Naghten "right or wrong" test, but rather his ability to comprehend his position as one accused of murder and to cooperate with his counsel in making a rational defense. See *Commonwealth v. Moon,* supra, and *Commonwealth ex rel. Hilberry v. Maroney,* supra, at 544. Or stated another way, did he have sufficient ability at the pertinent time to consult with his lawyers with a reasonable degree of rational understanding, and have a rational as well as a factual understanding of the proceedings against him. See *Dusky v. United States,* 362 U.S. 402 (1960). Otherwise, the proceedings would lack due process: *Bishop v. United States,* 350 U.S. 961 (1956). Moreover, if he lost his senses subsequent to the plea but before the judgment, the sentence could not validly be imposed until after his recovery. See *Commonwealth v. Ragone,* 317 Pa. 113, 176 A. 454 (1935).

Hilberry plead guilty to killing his wife by cutting her throat with a razor. He did not testify at trial. At the habeas corpus hearing he testified that he has now no recollection of the crime, his arrest, his trial attorneys, entering the plea of guilty, the plea and sentence proceedings, or in fact anything that occurred for a three-year period, at or about that time. Hilberry's statement of present lack of memory, even if true, would certainly not establish lack of mental competency at the controlling times, but there is other significant testimony in the record[2] which could lend

---

[2] We have studied and considered the record in depth including the testimony offered at the plea proceedings and the habeas corpus hearing, and in our discussion it is commingled and considered as a whole.

credence to and support such a finding. This may be summarized as follows:

The crime was committed on April 4, 1952. About eight years before, i.e., in June 1944, Hilberry was discharged from service in the United States Navy as "unfit for service" based upon the conclusion that he was suffering from "a profound personality disorder."[3] Dr. Dunaway, a psychiatrist, told the trial court that in her opinion Hilberry was not born with normal mental capacity, that his mentality before trial was that of a five to eight-year old and his ability to distinguish between right and wrong would be limited and similar to one of that age level. There was testimony of a layman that the night before the killing Hilberry acted in an irrational manner. Following his sentence, he was committed to the Western Pennsylvania Correctional Diagnostic and Classification Center on November 18, 1952. Within a few weeks thereafter, a resident physician of that institution recommended that a lunacy commission be appointed to examine Hilberry, and on December 30, 1952, such a commission was appointed by the court. As a result of the commission's findings and report to the court on January 8, 1953, that Hilberry was then insane and of criminal tendency, he was ordered committed to the Farview State Hospital for the criminally insane, where he remained until 1959.[4] In that year a commission found him sane, and he was returned to the Western Pennsylvania Correctional Diagnostic and Classification Center.

---

[3] A history of a troubled childhood, at the age of ten years a serious assault with a knife upon his sister, St. Vitus's dance at the age of twelve years, and excessive drinking from the age of seventeen years were included in the Navy Medical Report, but this also disclosed no psychotic manifestations were present.

[4] In 1958 he escaped from the hospital and remained free for a period, traveling in the western United States.

The foregoing, however, is only one part of the entire picture or one side of the coin, so to speak. Other testimony in the record establishes the following:

For some time prior to the killing, Hilberry and his wife suffered serious marital trouble and arguments over his excessive drinking. In 1945, 1949 and 1951, he was hospitalized for treatment of acute alcoholism. In January 1952, Hilberry struck his wife on the head and caused injury requiring suturing. Shortly thereafter, she instituted divorce proceedings, but discontinued the action on his promise to stop drinking and join Alcoholics Anonymous. Later he began drinking again, threatened her, and about one week before the killing she made arrangements to proceed with the divorce action. On the morning of the day of the killing, Hilberry phoned an insurance agent who had written a policy on his life, and requested that he call at their home so he could change the designated beneficiary therein. On the very evening of the killing and a short time prior thereto, the insurance agent visited the Hilberry home, as requested, and remained for a period of about twenty-five minutes during which time forms were prepared changing the insurance policy beneficiary from his wife to another person. During this period, while an aura of trouble in the home was manifest, Hilberry was sober and acted and talked rationally.

Immediately following the killing, Hilberry visited a neighbor's home and stated he "had just cut his wife's throat" and requested that the police be called. Shortly thereafter, when police officers arrived, he told them that he and his wife had an argument and he had cut her throat.

Within a short time thereafter, upon being taken to police headquarters, Hilberry detailed the occurrence of the crime in a lucid manner. He stated, inter alia,

that he became so upset with his wife's nagging that in a sudden impulse of anger he grabbed the razor and committed the killing. His statements were stenographically recorded. The typewritten statement was signed by Hilberry.

On May 7, 1952, the court appointed two members of the bar of Lawrence County to represent Hilberry. One of these lawyers had been practicing law over twenty years and enjoyed extensive prior criminal trial experience. Between the date of their appointment and the following September 5th, the date the plea of guilty was entered, and continuing through to the date of sentence, these lawyers jointly and individually saw and discussed the case with Hilberry numerous times. They also thoroughly investigated his background and, in cooperation with the district attorney, arranged to have Hilberry psychiatrically and medically examined.

Throughout the discussions of the case with his lawyers, Hilberry manifested a clear understanding of his position and the fact that he was charged with the murder of his wife. He cooperated in every way possible in supplying information that would be helpful. He told them of the confession given to the police and made no attempt to deny the truth thereof. He inquired about his wife's estate, and whether he could sell the home which was in her name and pay them for their services from the proceeds. He discussed with them the advisability of standing trial before a jury, the possible consequences thereof, or whether it was best to admit his guilt and throw himself on the mercy of the court. He also discussed with them the advisability of his testifying in court and accepted their recommendation that he refrain from doing so.[5]

---

[5] It was their conclusion that if he testified he would demonstrate complete mental responsibility and counteract other circumstances disclosed by the evidence which might act in mitigation.

As a result of their investigation of the case, the reports received from medical experts, and their observations of and discussions with Hilberry personally, these lawyers never entertained any doubt of his mental capacity to stand trial, or of his complete understanding of the situation he faced.

The plea of guilty was entered with Hilberry's complete approval. During the plea proceedings, testimony of medical witnesses indicated at the times concerned herein that Hilberry enjoyed a mental capacity of thirteen years or the equivalent of an eighth-grade education.

Throughout the plea and sentence proceedings, there was no indication that Hilberry did not understand what was transpiring. It was the opinion of the two judges who constituted the trial court that he was legally mentally competent at the time.[6] The sheriff who had custody of Hilberry from the beginning of his incarceration up to the date he was first transferred from the county prison to the state diagnostic center, and who personally transported him to the center on November 18, 1952, and also to Farview in January 1953, noticed a marked change in Hilberry when he saw him in January 1953.

While it is presumed that an accused who pleads guilty to an indictment in court knows what he is doing and the burden is on him to prove otherwise,[7] we have not concerned ourselves with this rule in the instant case, but rather have read and reread the com-

[6] In fairness to Hilberry, it must be noted that not much weight can be given to this opinion testimony because Hilberry was not orally examined by the court at anytime during the plea proceedings, and their conclusion as to his mental capacity was limited to an observation of his conduct in court.

[7] See *Commonwealth ex rel. Foeman v. Maroney*, 420 Pa. 486, 218 A. 2d 230 (1966), and *Commonwealth ex rel. Crosby v. Rundle*, 415 Pa. 81, 202 A. 2d 299 (1964).

plete record in an effort to determine the relevant truth. It is our conscientious conclusion, that at all relevant times Hilberry had a rational understanding of the nature of the plea and sentence proceedings; that he had a rational and factual understanding of the charges involved; that he was able to and did cooperate in a rational manner in assisting his lawyers in preparing a defense; that his plea was knowingly, intelligently and understandingly entered; and that there is no valid reason why either his conviction or sentence should be nullified.

We note that the court before whom the plea was entered included statements in its adjudication which indicate a conclusion inconsistent with Hilberry's competency; however, we are now satisfied that the court was thereby merely attempting to explain and warrant its action in imposing a life sentence rather than death.

Order affirmed.