422 A.2d 116
**COMMONWEALTH of Pennsylvania**
v.
**Gregory Scott SOURBEER, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 18, 1979.
Decided Feb. 1, 1980.
Reargument Denied Dec. 1, 1980.

22

Henry F. Gingrich, John M. Smith, Lancaster, for appellant.

Louise G. Herr, Asst. Dist. Atty., Edward F. Browne, Jr., Lancaster, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO, LARSEN and FLAHERTY, JJ.

## OPINION

FLAHERTY, Justice.

This is an appeal from a conviction of murder in the first degree in the Court of Common Pleas of Lancaster County on October 6, 1976. A judgment of sentence of life imprisonment was imposed.

Prior to trial, hearings were held on a petition to transfer the case to Juvenile Court, on a petition for commitment of a person charged with a crime and detained in a penal or correctional institution, and on an application to suppress a statement and evidence. Denials were entered by the court with respect to each of these.

On March 25, 1976, at approximately 8:36 p. m. a police officer was directed by his radio dispatcher to the scene of a fatal shooting at a residence in Columbia, Pennsylvania. The officer arrived at the scene at 8:38 p. m., and found appellant, Gregory Scott Sourbeer, who was fourteen years of age, alone, and the body of Gregory's mother seated in a chair in the living room of the residence. Gregory Sourbeer told the officer that he accidentally shot his mother while cleaning his gun. Since Gregory was alone, the officer had him transported to the police station at approximately 8:42 p. m., the officer remaining at the residence to investigate the incident.

On March 25, 1976, at 11:48 p. m., appellant, in the presence of his older brother, was given *Miranda* warnings by a state police officer. The warnings were read from a preprinted juvenile rights form, and Sourbeer's acknowledgment of his understanding of his constitutional rights was recorded thereon by the officer. Gregory then conferred privately with his brother for one half hour. Following this conference, appellant and his brother told the police they desired to consult with their family attorney. The attorney, arriving at the police station sometime after midnight on

March 26, 1976, conferred with appellant and his brother from 1:05 a. m. until 1:31 a. m., following which appellant agreed to answer police questions in the presence of his brother and the attorney. Appellant, his brother, and the attorney all signed a juvenile rights form waiving appellant's right to remain silent.

Appellant was interrogated by police from 1:32 a. m. on March 26, 1976 until 3:03 a. m., when he indicated that he was tired and wanted to sleep. During the interrogation, Gregory was permitted to smoke, and inquiry was made as to whether he wanted food or drink, and, at 2:05 a. m., he was given a soft drink during a break in the questioning. When, at 2:53 a. m., appellant was asked if he was tired or if he wished to continue the interrogation, he indicated that he was somewhat tired, but desirous of continuing the investigation. The attorney requested a consultation with the appellant, privately, after which the police were informed that appellant did not wish to answer further questions, and the interrogation was at an end. At 4:37 a. m. appellant was again advised of his constitutional rights and informed that he would be charged with murder. The appellant was transported to the office of a magistrate, arriving sometime between 5:15 a. m. and 5:30 a. m. on the morning of March 26, 1976, arraigned, and then taken to a detention center for juveniles.

The appellant raises many issues, but after considering all of them, we find they have no merit, and, accordingly, affirm the court below.

■ Appellant contends that it was error not to transfer the case to the Juvenile Division. The Juvenile Act[1] states in relevant part:

"[I]f it appears to the Court in a criminal proceeding charging murder, that the defendant is a child, the case may similarly be transferred and the provisions of this Act applied . . ." 11 P.S. § 50–303.

1. 11 P.S. § 50–303 repealed effective June 27, 1978 now 42 Pa.C.S.A. § 6322.

In *Commonwealth v. Pyle*, 462 Pa. 613, 662, 342 A.2d 101, 106 (1975), we said:

> Murder has always been excluded from the jurisdiction of the juvenile courts. See Act of July 12, 1913, P.L. 711, § 11 as amended 17 P.S. § 694, *Gaskins Case*, 430 Pa. 298, 244 A.2d 662 (1968). See also *Mont. Appeal*, 175 Pa.Super. 150, 103 A.2d 460 (1954). Having continued to place murder, even where a young offender is involved, within the original and exclusive jurisdiction of the adult court, the assumption that the need for adult discipline and legal restraint exists in cases of this heinous nature also continues. With this in mind it becomes the juvenile's burden to show that he does not belong in the criminal court. In other words, it is the youth who must prove that he belongs in the juvenile setting by showing his need and amenability to the "program of supervision, care and rehabilitation" which he would receive as a juvenile. In the event the evidence does not affirmatively demonstrate that he is the kind of youth who would benefit from the special features and programs of the juvenile court system, and in the event no special reason exists for sparing the youth from adult prosecution and punishment (as for instance, evidence of mental illness or retardation) jurisdiction would necessarily remain within the criminal court system.

The record discloses that appellant did not meet this burden of proof. Appellant's own psychiatrist testified that he could give only a very rough and questionable estimate of how long it would take for Gregory to overcome his personality disorder, which was described as persistent immaturity, inappropriate relationships with authority, unreliability, and rationalizations for behavior which result in prevarications which he believes to be true. Both the defense and prosecution psychiatrists diagnosed Gregory as having a passive-aggressive personality with anti-social tendencies. The prosecution's psychiatrist testified that appellant might act out his underlying aggression with violence.

When the appellant's psychiatrist was asked to give a time period when there would be a significant change in Gregory's personality disorder, he could only say that such a change could be expected in the vicinity of the ages thirty-five or forty. This, coupled with the fact that appellant was fifteen years old and would therefore be subject to the authority of the juvenile system for only three more years, amply supports the denial of this petition for transfer to Juvenile Court.

■ Regarding appellant's request for further psychiatric evaluation, the standard set forth in 50 P.S. § 7402(a) states in relevant part:

> Whenever a person who has been charged with a crime is found to be substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense, he shall be deemed incompetent to be tried, convicted or sentenced so long as such incapacity continues.

Appellant, according to his psychiatrist's testimony, knew and understood what was happening. Although the psychiatrists for both the prosecution and defense diagnosed appellant as a pathological liar, this is not sufficient in and of itself to establish incompetence. In *Commonwealth v. Kennedy*, 451 Pa. 483, 487, 305 A.2d 890, 892 (1973) this Court stated the test for competency when it said:

> In *Commonwealth ex rel. Hilberry v. Maroney*, 424 Pa. 493, 227 A.2d 159 (1967), we pertinently stated the following with respect to what the defendant must establish: "[T]he test to be applied in determining the legal sufficiency of his mental capacity to stand trial, or enter a plea at the time involved, is not the M'Naghten 'right or wrong' test but rather his ability to comprehend his position as one accused of murder and to cooperate with his counsel, in making a rational defense. See *Commonwealth v. Moon, supra*, 383 Pa. 18, 117 A.2d 96 [(1955)], and *Commonwealth ex rel. Hilberry v. Maroney, supra*, 417 Pa. 534 at 544, 207 A.2d 794. Or stated another way, did he have sufficient ability at the pertinent time to

consult with his lawyers with a reasonable degree of rational understanding, and have a rational as well as factual understanding of the proceedings against him. See *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Otherwise, the proceedings would lack due process: *Bishop v. United States*, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956)." Id., 424 Pa. at 495, 227 A.2d at 160. See also *Commonwealth v. Harris*, 431 Pa. 114, 243 A.2d 408 (1968).

See also *Commonwealth v. Harper*, 479 Pa. 42, 387 A.2d 824 (1978).

The psychiatric testimony was that appellant was not psychotic. The prosecution's psychiatrist testified that appellant had an I.Q. of 122 and could consult with his attorneys in his defense. Although both psychiatrists agreed that appellant's inclination toward prevarication would hinder his defense, they were also in agreement that appellant was cognizant of the truth, and that appellant's prevaricating was a defense mechanism to rationalize his behavior. The trial court properly found, as supported by the record, that appellant being a pathological liar is no more a handicap to an attorney's ability to prepare a defense than having a client who lies to counsel.

■ The assertions that the trial court erred in failing to suppress the statements of the appellant as not voluntarily made are totally without merit. After having been read his *Miranda* rights, appellant had the advice of counsel and his brother, an adult primarily interested in his welfare, thus, we are satisfied that all standards were fully complied with.

■ We are next asked to review whether the statement should have been suppressed for unnecessary delay between appellant's warrantless arrest and his arraignment. When the police arrived at the scene at 8:38 p. m., they found appellant alone and took him to the police station. Appellant was not under arrest at the time, nor did the police disbelieve that he had accidentally shot his mother. At 11:48 p. m. on March 25, 1976, appellant was read his

*Miranda* rights. At 4:37 a. m. appellant was again advised of his constitutional rights and told he was to be charged with murder. Appellant was then transported to the local office of a District Justice where he was arraigned between 5:15 a. m. and 5:30 a. m. on the morning of March 26, 1976. Prior to reading the appellant his rights at 11:48 p. m., the record shows that the police extended every courtesy to the appellant. The total amount of time from appellant's apprisal of his constitutional rights to his arraignment was five hours and forth minutes. We believe this time lapse was justifiable and necessary under the circumstances shown by this record.

■ It is further raised that it was error to refuse to suppress items of physical evidence seized by the police. The trial court correctly found the items seized were in plain view, or they were seized as a result of a valid consent search.

The police were clearly justified in being in the house where the shooting had been reported, and while the police were securing the residence by making certain all doors and windows were locked and closed, they seized ten items in plain view, of which only two were admitted into evidence at trial. One of these was a box containing four shotgun shells found in appellant's bedroom on a shelf approximately four feet high in an open box one inch in depth. These shells matched the spent shell in the chamber of the shotgun and were traced to defendant. This shelf was bracketed by two windows so that it was necessary to pass the shelf in order to secure the windows. The other item seized and admitted at the trial was a can of oil which was found on the sink next to the kitchen counter. There were also fourteen items seized from the living room of the house where the dead body was found, certainly in plain view.

■ Subsequent searches of the residence were consented to by appellant's older brother, and, although the person who gave consent was a named executor in the decedent's will, letters testamentary had not been issued at the time of

the consent. Appellant challenges the authority of the executor to give consent prior to letters being granted according to law. Where one names an executor, a decedent has expressly reposed special trust in the person so named, and must be presumed to have intended authority during the period between death and actual probate under certain circumstances. We held in *In Re Purman's Estate*, 334 Pa. 238, 5 A.2d 906 (1939), for example, that letters testamentary, when granted, relate back so as to validate acts previously performed by the executor so long as they are for the conservation and administration of the estate. Here, the administration of the estate would be affected, in that Gregory, if convicted of intentionally killing his mother, would be excluded from participating in the distribution of his mother's estate. The Slayer's Act, 20 Pa.C.S.A. § 8801 et seq. Furthermore, under assorted circumstances someone must be in a position to act prior to the official grant of letters, and, at least under the circumstances presented by these facts, we hold that the named executor had sufficient control over the premises and was, thus, authorized to provide the necessary consent for the ensuing search.

Appellant argues it was error for the trial court to refuse to sequester the jury. Pennsylvania Rule of Criminal Procedure 1111(a) provides:

"The trial judge may, in his discretion, order sequestration of trial jurors in the interest of justice."

Absent a showing of potential prejudice from the refusal to sequester a jury, the discretion of the trial court will not be disturbed. *Commonwealth v. Bruno*, 466 Pa. 245, 352 A.2d 40 (1976). All that appears in this record is that several prospective jurors testified on voir dire that one of the prospective jurors had worked with the decedent. A review of the record discloses that the trial judge adequately instructed each juror to refrain from reading, watching, or listening to media accounts of the incident, and sequestered the jurors during deliberation. We see no abuse of discretion under the facts of this case.

 A further issue raised is that it was error to admit photographs of the victim's body. In *Commonwealth v. Petrakovich*, 459 Pa. 511, 521, 329 A.2d 844, 849 (1974) we said:

We have consistently held that the question of admissibility of photographs of a corpse in homicide cases is a matter within the discretion of the trial judge and only an abuse of that discretion will constitute reversible error. . . . When the trial judge is confronted with gruesome or potentially inflammatory photographs, the test for determining their admissibility which he must apply is "whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." *Commonwealth v. Powell*, supra, 428 Pa. at 278–279, 241 A.2d at 121.

In *Petrakovich*, three black and white photographs were held to be non-inflammatory. One picture showed the upper half of the body covered by a waitress uniform which was blood stained. The other two photographs depicted the nude upper torso showing where bullets entered and left. The black and white photographs in appellant's case are much less objectionable than those in *Petrakovich*. The body of the victim was fully clothed and seated in a chair. The victim's face was not contorted and the only wound was in the neck. The photographs were not taken at close range. In *Commonwealth v. Collins*, 440 Pa. 368, 269 A.2d 882 (1970) we held that photographs of a corpse are not per se inflammatory. The photographs in question here depicted the position of the victim, the angle from which the shotgun would have been fired, the arrangement of the furniture in the living room, the shotgun, and the gun cleaning equipment. Thus, not only were the photographs far from inflammatory, but of clear probative value, and their admission into evidence was quite proper.

 During the trial the Commonwealth introduced testimony of various individuals to show the appellant forged checks on his mother's bank account and that he had previ-

ously attempted to kill his mother with rat poison. The introduction of this testimony did not constitute error, as, under the record presented here, these acts were probative to show motive and intent. The acts were not remote in time and not collateral incidents; thus, the trial judge did not abuse his discretion in admitting the evidence of other crimes in this instance.

■ Appellant contends it was error to introduce the entire statement given by appellant beyond the context of the admission contained therein. In *Commonwealth v. Cristina*, 481 Pa. 44, 53, 391 A.2d 1307, 1312 (1978) we said, "[e]ven an admission or confession shown to be false may be admissible to prove something other than the matter falsely confessed", and, further, in *Commonwealth v. Bolish*, 381 Pa. 500, 524, 113 A.2d 464, 476 (1955) we said, "[F]alse or contradictory statements by the accused are admissible since the jury may infer therefrom that they were made with an intent to divert suspicion or to mislead the police or other authorities, or to establish an alibi or innocence, and hence are indicatory of guilt." The appellant's statement here was an admission and was correctly admitted to show that his stated account of the shooting incident was false.

■ It is argued that the Court was in error by not allowing testimony which sought to rebut the presumption of the capacity of a child to commit a crime, apparently based on an assumption that the capacity of a child to commit a criminal act differs from that of other individuals. While it is true we recognize the common law rule that a child under the age of seven is conclusively presumed to lack the capacity to commit a crime, and that there is a rebuttable presumption that a child between the ages of seven and fourteen is incapable of committing a crime, the appellant, fourteen years and eleven months at the time of the act, was responsible as an adult for his criminal actions. We see no error here. Regarding the issue of diminished capacity, the charge of the court was perfectly proper.[2]

**2.** The trial judge charged the jury as follows:

32

■ At trial a motion in the nature of a demurrer was made at the close of the *Commonwealth's* case, which was denied. The appellant then proceeded to present a case in defense. We need not discuss this allegation of error inasmuch as we held in *Commonwealth v. Ilgenfritz*, 466 Pa. 345, 353 A.2d 387 (1976) that, under such circumstances, the correctness of the ruling on demurrer is not an available

"When a defendant is charged with a crime which requires that a certain specific intent or mental state be established in order to constitute the crime or degree of crime, you must take all the evidence into consideration and determine therefrom if, at the time when the crime allegedly was committed, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent essential to constitute the crime or degree of crime with which he is charged. If, because of the defendant's diminished capacity, and from all the evidence, you have a reasonable doubt whether the defendant was capable of forming such specific intent, you must give the defendant the benefit of the doubt and find that he did not have such specific intent.

If you find from the evidence that at the time of the alleged crime the defendant had substantially reduced mental capacity, whether caused by mental defect, abnormality, or any other cause, you must consider what effect this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of the crime charged. Thus, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt as to whether he did, maturely and meaningfully, premeditate, deliberate, and reflect upon the gravity of his contemplated act, or form an intent to kill, you cannot find him guilty of a willful, deliberate and premeditated murder of the first degree.

Also, if you find that his mental capacity was diminished to the extent that you have a reasonable doubt whether he did harbor malice aforethought, you cannot find him guilty of murder of either the first or third degree. Further, if you find that the defendant's mental capacity was diminished to the extent that he neither harbored malice aforethought nor had an intent to kill at the time of the alleged crime, you cannot find him guilty of either murder or voluntary manslaughter, but must acquit the defendant and find him not guilty.

There is no malice aforethought if the evidence shows that due to diminished capacity caused by the defendant's mental illness or defect, he did not have the capacity to attain the mental state constituting malice aforethought, even though the killing was intentional, voluntary, deliberate, premeditated and unprovoked.

If you find that the defendant has a diminished capacity due to his personality disorder, this diminished capacity may be considered by you in determining whether or not there is reasonable doubt as to the defendant's guilt of the crime charged." (R. 1192–1195)

issue on appeal. Also waived, and not properly presented for appeal, is the issue of the failure to charge the jury on involuntary manslaughter.

A review of the record demonstrated that the verdict was far from against the weight of the evidence; thus, we need not delineate in this regard.

Further waived from review is the assertion that the trial judge did not order a second presentence investigation and a psychiatric evaluation of the appellant concerning whether he was competent to be sentenced, as it was not raised in objections filed directly after sentencing. *Commonwealth v. Shoemaker*, 462 Pa. 342, 341 A.2d 111 (1975). *Commonwealth v. Walls*, 481 Pa. 1, 391 A.2d 1064 (1978).

Lastly, appellant challenges the constitutionality of mandatory life imprisonment for murder in the first degree. Our decisions in *Commonwealth v. McKenna*, 476 Pa. 428, 383 A.2d 174 (1978) and *Commonwealth v. Moody*, 476 Pa. 223, 382 A.2d 442 (1977) invalidated the death penalty portion of 18 Pa.C.S.A. § 1102(a) but did not address the constitutionality of mandatory life imprisonment under the remaining portion of the sentencing statute. This penalty is not cruel and unusual punishment for it is not an excessive and unnecessary punishment disproportionate to the crime and does not shock the moral conscience of the community. These considerations, coupled with the fact that life sentences lack the ponderous finality of the death penalty, induce us to uphold mandatory life sentences for murder in the first degree. Mandatory life sentences imposed on life prisoners for conviction of assault were upheld by the Superior Court in *Commonwealth v. Dessus*, 262 Pa.Super. 443, 396 A.2d 1254 (1978) where, quoting from *Commonwealth v. Bryant*, 239 Pa.Super. 43, 361 A.2d 350 (1976), the Superior Court stated:

". . . the legislature has sought [sic] fit to specify mandatory life imprisonment as punishment for assaults committed by prisoners already serving life terms. We do not believe that such punishment is so disproportionate to

the offense as to amount to cruel and unusual punishment. Such punishment is clearly intended to serve as a deterrent, and it is not the province of this Court to substitute its judgment for the judgment of an assembly properly exercising its legislative powers. 239 Pa.Super. at 46, 361 A.2d at 352."

262 Pa.Super. at 450, 396 A.2d at 1257. We believe the same reasoning applies to mandatory life sentences for murder in the first degree and so hold.

■ To the extent that the provision under which appellant was sentenced, 18 Pa.C.S.A. § 1102(a), conflicted with former 19 P.S. § 1057 which required that minimum and maximum sentences be set, the conflict is to be resolved by applying 1 Pa.C.S.A. § 1936 which states: "Whenever the provisions of two or more statutes enacted finally by different General Assemblies are irreconcilable the statute latest in date of final enactment shall prevail." [3] Since 19 P.S. § 1057 was enacted in 1911 and amended in 1923 and 18 Pa.C.S.A. § 1102 was enacted in 1974, the latter section takes precedence.[4]

Judgment of sentence affirmed.

MANDERINO, J., did not participate in the decision in this case.

EAGEN, C. J., concurs in the result.

ROBERTS, J., filed a dissenting opinion in which NIX, J., joins.

ROBERTS, Justice, dissenting.

Appellant is not, as the majority would believe, like any client who "lies" to counsel. Rather, because of a mental disability, appellant believes his "lies." Nonetheless, the

3. Act of Nov. 25, 1970, P.L. 707, No. 230, added, Act of Dec. 6, 1972, P.L. 1339, No. 290, § 3, 1 Pa.C.S.A. § 1936 (1979 Supp.)

4. Act of June 19, 1911, P.L. 1055, § 6, as amended, 19 P.S. § 1057 (1964) (repealed 1978, current version at 18 Pa.C.S.A. 1321(e)).
 Act of March 26, 1974, P.L. 213, No. 46, § 2, 18 Pa.C.S.A. § 1102 (1979 Supp.)

majority concludes that the trial court properly denied appellant's request for further psychiatric evaluation pursuant to the Mental Health Procedures Act, Act of July 9, 1976, P.L. 817, §§ 101 et seq., 50 P.S. §§ 7101 et seq. (Supp.1979). I must dissent. Even the Commonwealth's own psychiatrist recognizes that appellant's disability makes him unable to assist counsel in the preparation of a defense. Consistent with section 402(a) of the Mental Health Procedures Act, appellant's request for further evaluation should have been granted, judgment of sentence should be vacated, and the case should be remanded for proceedings consistent with section 403 of the Act.

NIX, J., joins in this dissenting opinion.