**Commonwealth v. Behr**

*Michael R. Cauley*, for Commonwealth.
*William F. Scarpitti* and *John H. Moore*, for defendant.

CONNELLY, J., March 20, 1987 — This matter comes before the court pursuant to defendant Christopher Michael Behr's motion for transfer from the criminal division of the court of common pleas to the juvenile division of the court of common

pleas. Under the applicable law,[1] on January 8 and 9, 1987 this court held a transfer hearing at which time the defendant was mutually represented by William F. Scarpitti, Jr., Esq. and John H. Moore, Esq. Counsel for defendant presented testimony on behalf of the juvenile petitioner at this hearing to support the petition that he be transferred to the juvenile court's jurisdiction for treatment as a juvenile. The Commonwealth, represented by Michael R. Cauley, Esq., first assistant district attorney, presented testimony to support their position that the defendant be treated as an adult in the criminal division of the court of common pleas.

After reviewing the testimony presented by both parties at the transfer hearing, and following the filing of briefs by both parties, this court now enters the following opinion and order.

The salient facts can be briefly summarized as follows:

On October 22, 1986, defendant Christopher Michael Behr shot and killed Kevin P. Kelly. The juvenile petitioner was charged with Criminal Homicide/Murder and Possessing Instruments of Crime. The relevant facts and circumstances surrounding this incident are as follows: Both youths were 15 years of age at the time of the shooting. Kevin Kelly was an eighth grader at James S. Wilson Middle School and Christopher Behr attended Cathedral Prep High School and was a sophomore at the time of the shooting. Defendant Christopher Behr and Kevin Kelly grew up in the same neighborhood. Despite being relatively good friends in their younger years, the two boys grew apart over time. The source of the conflict, as indicated by the

---

1. 42 Pa.C.S. §6301, et seq., the Juvenile Act, discussed infra.

testimony at the hearing, was essentially the high school that defendant attended and defendant's continued refusal to participate in athletic games with the victim and other neighborhood children. Cathedral Prep is an all-male, private, college preparatory school. Conversely, J. S. Wilson is a feeder school to McDowell High School which is a primary rival of Cathedral Prep. McDowell is a co-ed, suburban, public school. Apparently the victim along with others would harass defendant about attending Cathedral Prep and refusing to engage in sports with the neighborhood children. Specifically, prior to the time of the shooting, testimony indicates that the victim harassed Christopher Behr by calling him various names and engaged in forms of intimidation. This court notes that defendant is slight in build and was never at any time the instigator of any of the conflicts, but in fact tried to avoid any confrontation with the victim as a result of the remarks and comments made by Kevin Kelly.[2] Testimony also indicates, and is undisputed, that on the day of the shooting Kevin Kelly was playing football with his friends on a field which was across the street from where juvenile petitioner lived. On this particular day testimony demonstrates that Kevin Kelly had made some critical remarks to defendant pertaining to defendant's choice of schools and defendant's sexual preference. Specifically, Kevin Kelly had called defendant various names such as "Prep fag" and had accused defendant of masturbating. The record is also clear that on this date Kevin Kelly

---

2. However, it should be pointed out that at no time prior to or during this incident did the victim's conduct ever amount to more than words and threats, and that at no time did the victim ever physically assault defendant, or indeed even touch him, either prior to or during the day of the fatal shooting.

approached defendant's house while defendant was in his yard trimming the bushes. The victim, without provocation, went over to defendant's house with a group of his friends who were playing football at the time. As Kevin Kelly approached defendant he continued to taunt and criticize defendant. The testimony also illustrates that at this time, defendant went into the house and came out with what was apparently a .12 gauge shotgun. After some argument and dispute between the two youths, and while Kevin Kelly's friends were present, defendant shot Kevin Kelly three times resulting in the death of Kevin Kelly.[3] Consequently, defendant is now before the court under the general charges of criminal homicide/murder and possessing instruments of crime.

The sole issue to be determined by this court is:

Whether, Christopher Michael Behr, a juvenile defendant charged with murder, shall be tried as an adult in the criminal division of the court of common pleas or be transferred to the juvenile court system for treatment as a juvenile?

In evaluating this most critical issue, this court must first affirmatively set forth the correct and relevant standards that must be applied when determining whether or not to transfer a juvenile defendant charged with murder back to the juvenile court system. The legal standard regarding transfer of a juvenile charged with murder is governed by the Juvenile Act which is embodied in 42 Pa.C.S. §6301, et seq.

---

3. Defendant does not allege, nor is there any evidence from which it can be inferred that the shooting took place in self-defense or in any way which was legally justified. Indeed, the facts of the incident, as presented to the court may well rise to the level of first degree murder.

Specifically, the law applicable to this area is contained in the Judicial Code, 42 Pa.C.S. §6322(a), titled Transfer From Criminal Procedures. This section states in appropriate part:

"(a) General rule: [I]f it appears to the court in a criminal proceeding other than murder, that the defendant is a child, this chapter shall immediately become applicable, and the court shall forthwith halt criminal proceedings, and, where appropriate, transfer the case to the division or a judge of the court assigned to conduct juvenile hearings, together with a copy of the accusatory pleading and other papers, documents, and transcripts of testimony relating to the case. If it appears to the court in a criminal procedure charging murder, that the defendant is a child, the case *may* similarly be transferred and the provisions of this chapter applied." (Emphasis added.)

Pursuant to 42 Pa.C.S. §6322(a), the court in a criminal proceeding against a juvenile charged with murder *may* transfer the action to juvenile court. In the case of murder, Pennsylvania courts have consistently interpreted the Juvenile Act as signifying the legislative intent that the crime of murder is of such a serious nature as to originally exclude a juvenile accused of murder from the benefits and special treatment afforded by the act. Consequently, the legislature has excluded the crime of murder from the original jurisdiction of juvenile courts. Commonwealth v. Sourbeer, 492 Pa. 17, 422 A.2d 116 (1980); Commonwealth v. Wade, 485 Pa. 453, 402 A.2d 1360 (1979); Commonwealth v. Pyle, 462 Pa. 613, 342 A.2d 101 (1975); Commonwealth v. Zoller, 345 Pa.Super. 350, 498 A.2d 436 (1985); Commonwealth v. Waters, 334 Pa.Super. 513, 483 A.2d 855 (1984), cert. denied 105 S.Ct. 2679, 86 L.Ed.2d 697 (1985).

It is clear from the language of the act that transfer from the criminal court in murder cases is not a matter of right and the determination of whether the interests of the state and society require prosecution of murder or an indictment is left to the sound discretion of the common pleas court. Commonwealth v. Pyle, supra, 342 A.2d at 104; Commonwealth v. Zoller, supra, 498 A.2d at 439. In the case of murder, it is the juvenile who shoulders the burden of proving that he should be afforded juvenile treatment as opposed to a trial as an adult in criminal court. Commonwealth v. Pyle, supra, 462 at 622-23, 342 A.2d at 106-07; see also Commonwealth v. Moyer, 497 Pa. 643, 444 A.2d 101 (1982); Commonwealth v. Pettus, 492 Pa. 558, 424 A.2d 1332 (1981). The evaluation is generally reduced to a balancing test with the need for legal restraint to protect society on one side of the scale weighed against the interests of the juvenile and his need for treatment under the juvenile system on the other side.

Certain factors and criteria must be looked at in determining whether to transfer the juvenile to the juvenile system. Recently, a committee of conference of the part of the house of representatives and senate submitted to legislation Bill no. 1498 entitled; "An act amending Title 42 (Judiciary and Judicial Procedure) of the Pennsylvania Consolidated Statutes, further providing for sentencing Procedures for Murder of the First Degree and Rape, for Sentencing guidelines, for Community Public Service Programs and For Costs and Expenses of Care of Certain Children." Bill no. 1498 was approved by the Governor and enacted on December 11, 1986.[4]

---

[4] Act no. 165, December 11, 1986.

Particularly important to this court is section 7 of the bill which supplemented and amended section 6322 of Title 42. The following sentences were added to section 6322:

"In determining whether to transfer a case charging murder, the court shall apply the criteria in section 6355(a)(4)(iii)(A) (relating to transfer to criminal proceedings). However, the child shall be required to show the court that the child is amenable to treatment, supervision or rehabilitation as a juvenile by meeting the criteria listed in section 6355(a)(4)(iii)(A)."

The relevant amendment in section 6322 now makes it mandatory for the child to show the court that he is amenable to treatment, supervision or rehabilitation as a juvenile by meeting the criteria listed in 42 Pa.C.S. §6355(a)(4)(iii)(A). The criteria listed in section 6355(a)(4)(iii)(A) are:

1. Age.

2. Mental capacity.

3. Maturity.

4. The degree of criminal sophistication exhibited by the child.

5. Previous records, if any.

6. The nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the Juvenile Court to rehabilitate the child.

7. Whether the child can be rehabilitated prior to the expiration of the Juvenile Court jurisdiction.

8. Probation or institutional reports, if any.

9. The nature and circumstances of the acts for which the transfer is sought.

10. Any other relevant factors.

Section 11 of Bill no. 1948 states:

"(a) Section 1 (repealing section 1520) and sec-

tion 2 (adding section 1521) shall take effect immediately.

(b) The remainder of this act shall take effect in 60 days."

Consequently, section 7 of Bill no. 1948, relating to Title 42 §6322, was to take effect 60 days after December 11, 1986. The amended portion of section 6322 was, therefore, effective as of February 9, 1987.

The above mentioned factors must be analyzed in light of the relevant case law in this area. This court, therefore, now turns to a brief discussion of the leading cases wherein the material issues related to juvenile transfer have been addressed by the appellate courts of Pennsylvania.

Case law has been consistent with its interpretation and development of such criteria. Perhaps the most precedential case which sets forth and explains the necessary criteria that a court is to consider in a juvenile transfer case is Commonwealth v. Pyle, supra. In Pyle, the Pennsylvania Supreme Court stated that the youth must prove that he belongs in the juvenile setting by showing his need and amenability to the "program of supervision, care and rehabilitation" which he would receive as a juvenile. Id., supra, A.2d at 106; see also Commonwealth v. Wallace, 495 Pa. 295, 433 A.2d 856 (1981). This is the general standard, however; to be effective and complete in its analysis, this court must look to the several specific factors when determining if the juvenile petitioner is to be afforded treatment in the juvenile system.

To determine a juvenile's need for juvenile treatment and his amenability to such treatment the court will look at all of the following:

1. The individual child's personal makeup (e.g. mental capacity and maturity as determined by con-

sideration of his home and school environmental situation, emotional attitude and pattern of living).

2. The child's previous history (including any previous contact with law enforcement agencies and/or juvenile courts).

3. The nature and circumstances of the alleged homicide (e.g. inquiry into whether the killing was committed in an aggressive, violent or willful manner, whether the safety of the community requires lengthy incarceration). Commonwealth v. Pyle, supra, 462 Pa. at 623, n.14, 342 A.2d at 106-07, n.13. See also Commonwealth v. Sourbeer, supra; Commonwealth v. Zoller, supra; Commonwealth v. Waters, supra; Commonwealth v. Brown, 332 Pa.Super. 35, 480 A.2d 1171, 1175 (1984); Commonwealth v. Romeri, 504 Pa. 124, 470 A.2d 498 (1983), cert. denied 104 S.Ct. 1922, 80 L.Ed.2d 469 (1984).

Particularly important to the court's consideration is the nature and circumstances of the alleged homicide. In Pyle, supra, the court found that there was amenability and need for treatment provided by the juvenile court but because of the premeditated, vicious nature of the crime, and lack of remorse for the victim, there was not sufficient time within the maximum available under the juvenile court jurisdiction (age 21) to assure rehabilitation and to protect society. Similarly, in Commonwealth v. Zoller, supra, despite testimony that the juvenile came from a deprived background and made a good adjustment and progress while in detention, the court found that this did not "carry the day" in proving his amenability to the juvenile system. Id. 498 A.2d at 439-440. The court in Zoller, supra, was not satisfied that society would be protected. In Zoller, supra, the court stated:

"This case was a classic case of first-degree murder which conceivably could have brought the death penalty. The lack of remorse for the victim despite remorse for his family, shows a hardness of heart that bodes ominously for future persons with whom appellant comes into contact, who are "depersonalized," the term used by appellant to explain his killing of Harter." Id. 498 A.2d at 440.

Whether or not a juvenile could be rehabilitated during his minority is of tremendous importance for courts to consider when determining if the child should be transferred to the juvenile system. The court in Zoller, supra, relied on Commonwealth v. Sourbeer, supra, in which the Pennsylvania Supreme Court held, in considering psychiatric testimony, that when rehabilitation could not be assured during the child's minority, while subject to juvenile court jurisdiction, the youth failed to meet the required proof that he was amenable to juvenile rehabilitation. Id. 498 A.2d at 440. See also, Commonwealth v. Pyle, supra. Consequently, there must be some assurance that the juvenile can be rehabilitated during the child's minority while under juvenile court jurisdiction before the court will transfer the juvenile back to the juvenile system.

Noting the above discussion, and in determining the juvenile petitioner's need and amenability for treatment as a juvenile, it is now imperative for this court to apply the law, specifically the above-mentioned criteria, to the facts of this case.

I. The Juvenile Petitioner's Personal Makeup

This court will initially analyze those factors which relate to the juvenile petitioner's personal makeup, including his age, school environment, home environment and general character. In the ju-

venile petitioner's favor is the fact he is and was only 15 years of age at the time of the shooting. This court in conjunction with the petitioner's age also recognizes that he possesses the average mental capacity and maturity of a normal 15-year-old. Testimony was consistent and cumulative to the effect that the juvenile petitioner is polite, courteous and respectful of authority. The juvenile petitioner's school records[5] indicated that Christopher Behr was an average student who performed well in class and was never a disciplinary problem. In fact, considering his average intelligence, the juvenile petitioner was described as an overachiever in the classroom. Testimony was given by Sister Mary Alice Reed, the principal at Christopher Behr's grammar school, that the juvenile petitioner was active as an altar boy, was always willing to offer voluntary service, and was always well behaved. It is, therefore, apparent to this court that the juvenile petitioner was a good student, who was rarely tardy or a disciplinary problem, and that he had a stable school environment. To corroborate the testimony that juvenile petitioner was polite and well behaved, William F. Barber, a Pennsylvania State Police Trooper, testified that he knew juvenile petitioner from Peek'n Peak where Christopher Behr was a junior ski racer. Mr. Barber testified that he was very impressed with Christopher Behr's behavior, and his well mannered politeness.

Juvenile petitioner comes from a supportive, stable and close-knit home environment. Ronald Coleman, a juvenile counselor at the Edmund L. Thomas Detention Center who had spent several hours

---

5. Defendant's Exhibit 1 — academic records from Cathedral Prep; testimony of teachers and those who knew him, i.e., Mary Lou DeLuca and Sister Mary Alice Reed.

alone in the observance of Christopher Behr, testified at the transfer hearing that juvenile petitioner had a strong and very supportive family. Mr. Coleman's testimony was corroborated by William Kirk, M.D., the psychiatrist who spent approximately 28 hours interviewing juvenile petitioner and a minimum of six hours talking with the parents of Christopher Behr. Dr. Kirk testified that it was his professional opinion that Christopher Behr was very close with each member of his family, in fact, he described the family environment as close knit, "enmeshed." Consequently, the testimony consistently indicated to this court juvenile petitioner comes from a solid, supportive and stable home environment, which is certainly a factor in his favor.

The testimony of Frank Pizzat, Ph.D., the child psychologist who examined Christopher Behr, as well as testimony by Dr. Kirk and Ronald Coleman, demonstrates that juvenile petitioner's mental capacity and maturity is age-appropriate and clearly not that of an adult. Specifically, Dr. Pizzat stated to the court that juvenile petitioner would be devastated if placed in the adult penal system because he is not mature enough or strong enough. Dr. Kirk stated that juvenile petitioner was passive and not as mature as an adult and would be vulnerable in the adult system. In fact, Dr. Kirk testified that Christopher Behr would be what is commonly called a "chicken," or one who is constantly taken advantage of if placed in the adult system. Further, this court, through its own observations, notes that juvenile petitioner looks like a normal 15-year-old boy who is of slight build and in no way gives the appearance of physical adult maturity.

By contrast, in Commonwealth v. Brown, supra, juvenile appellant who was denied his transfer request was shown to have occasionally been involved

in fights at school, had once been suspended from school, had several unexcused absences from and had no significant work history. Id., 480 A.2d at 1175. In Brown, supra, the court stated:

More importantly, the psychologist testified that:

"I asked him if he felt he would fall apart or be taken advantage of in an adult facility. He indicated that he felt that he could handle himself in an adult institution. My findings agree with that, that he probably would not deteriorate or show any significant emotional problem." Id. Comparing Brown to the case sub judice, it is clear that in the present case we have an opposite set of circumstances pertaining to the juvenile's personal makeup. As the testimony indicated Christopher Behr was never a problem in school and further, was not mature enough to handle placement in an adult facility. Unlike the juvenile offender in Brown, supra, the testimony of Dr. Kirk, a psychiatrist, and Dr. Pizzat, a psychologist, was that Christopher Behr would be vulnerable and be taken advantage of if placed in the adult system and would, consequently, be devastated. In their professional, expert opinions Christopher Behr could not physically or mentally cope with placement in the adult system. These opinions were not rebutted by any testimony presented by the Commonwealth.

Consequently, this court is satisfied that the juvenile petitioner has sustained his burden of proof in this area and is impressed with the fact that Christopher Behr has a stable and supportive family life, a stable and well adjusted school environment, and is a normal age-adequate 15-year-old male not prepared for adult placement. These are factors which go to Christopher Behr's makeup, (see Commonwealth v. Pyle, supra, and its contingency of cases), and are to be considered by the court when deciding

whether to transfer the juvenile petitioner to the juvenile system. After reviewing the testimony, this court is impressed with the juvenile petitioner's personal makeup and finds that the criteria which constitute and comprise the juvenile petitioner's makup are certainly favorable.

## II. The Juvenile Petitioner's Previous Criminal History

Next, this court will consider Christopher Behr's previous criminal history or involvement with law enforcement agencies. Dr. Thomas Gamble, Supervisor of the Edmund L. Thomas Detention Center, testified that Christopher Behr has no juvenile prior record of any kind. Juvenile petitioner in the present case has never had any previous contact with law enforcement agencies or the juvenile courts. This court is convinced that Christopher Behr is truly a "first offender." Although this does not serve to mitigate the seriousness of the offense committed, it is a proper consideration for this court to consider when deciding whether to transfer the juvenile petitioner back to the juvenile system. Further, as testified to by Ronald Coleman, juvenile petitioner demonstrates none of the criminal sophistication that many other youthful offenders possess. Juvenile petitioner stated to Dr. Kirk, who in turn testified to this court, that the only "criminal" act that juvenile petitioner had ever performed was when he took a piece of bubble gum from a grocery store when he was very young. Dr. Kirk testified that juvenile petitioner was punished very severely by his father and never was known subsequent to that incident to have ever performed any delinquent acts. The testimony of some of the character witnesses, including Christopher Behr's 15-year-old friend, Dennis

Oborski, informed the court that Christopher Behr was never known to associate with other juvenile delinquents or gangs. Cumulative testimony indicated that Christopher Behr had few friends and often preferred to be by himself or with his family. Therefore, in light of this testimony, this court again finds that it is in juvenile petitioner's favor that he has no prior juvenile delinquent history or criminal involvement of any kind.

As previously set forth in 42 Pa.C.S. §6355(a)(4)(iii)(A), this court is also to consider any probation or institutional reports. Ronald Coleman, the guidance counselor at the Edmund L. Thomas Detention Center, testified that Christopher Behr was well behaved, polite and courteous. Mr. Coleman also testified that juvenile petitioner expressed great remorse and concern for not only the victim, but also the victim's family and his own family. Mr. Coleman was aware that juvenile petitioner often prayed for the victim and the victim's family and even expressed to Mr. Coleman that if he could change places with the victim he would. Mr. Coleman also stated in his testimony that Christopher Behr would often cry himself to sleep, and Mr. Coleman stated this was unlike other youthful offenders. Mr. Coleman also stated that Christopher Behr had adjusted quite well to his juvenile incarceration as evidenced by his respect for authority and cooperation with the other delinquents. In fact, Mr. Coleman stated that Christopher Behr even tried to console and comfort another juvenile who would constantly cry in bed. Dr. Gamble, the supervisor of Edmund L. Thomas Detention Center, corroborated Mr. Coleman's testimony by stating that he observed juvenile petitioner, noted that he respected authority and seemed to have made the adjustment to juvenile incarceration quite well. This court

again finds it favorable to juvenile petitioner that he has adjusted well to his juvenile incarceration (this will be discussed later in this opinion, particularly when addressing juvenile petitioner's need and amenability to be treated in the juvenile system). Also, this court gives great weight to the remorse the juvenile petitioner has expressed for the victim and the victim's family.

### III. The Juvenile Petitioner's Probability of Rehabilitation Prior To Expiration of The Juvenile Courts Jurisdiction

Another crucial factor for this court to consider is whether juvenile petitioner can be rehabilitated prior to the expiration of the juvenile court's jurisdiction. Pennsylvania courts have consistently placed great emphasis on this factor. As previously mentioned in this opinion, the Pennsylvania Superior Court in Commonwealth v. Zoller, supra, 498 A.2d at 440, the court stated:

"This case is governed by the finding in Commonwealth v. Sourbeer, 492 Pa. 17, 422 A.2d 116 (1980), in which our Supreme Court held, in considering psychiatric testimony, that when rehabilitation could not be assured during the child's minority, while subject to juvenile court jurisdicition, the youth failed to meet the required proof that he was amendable to juvenile treatment. Also see Pyle, supra.

In Zoller, supra, it was evident to the court that no assurance could be given that appellant's antisocial and aggressive behavior could be abated with treatment before his 21st birthday. Id., 498 A.2d at 439. The present case is clearly distinguishable from the rationale used in Zoller, supra. First, testimony was consistent and unrebutted that the juvenile peti-

tioner is neither aggressive nor antisocial. The testimony of the psychiatrist in our case, Dr. William Kirk, was definite and unequivocal. Dr. Kirk testifed that although Christopher Behr needs assertiveness training and intensive long-term psychiatric treatment, he was clear and definite in stating Christopher Behr could be rehabilitated before he reached age 21. Dr. Kirk stated that Christopher Behr was "eminently rehabilitatable." Dr. Kirk did state that in the "ideal" setting at a juvenile institution in Texas or Florida juvenile petitioner could be rehabilitated between 18 months and 36 months. In a "non-ideal" setting, Dr. Kirk testified that Christopher Behr was "certainly rehabilitatable within five and a half years," or before he reached the age of 21. Dr. Kirk, based on his 30 years' experience, expressed that juvenile petitioner is a psychiatric case in need of assertiveness training and who clearly and definitely could be rehabilitated before age 21 in the juvenile system. Dr. Pizzat, the child psychologist, expressed to the court that he was very confident the juvenile system could rehabilitate Christopher Behr. Dr. Pizzat stated that there was no evidence that the juvenile petitioner was sociopathic, but rather was capable of responding in a pro-social way with treatment in the juvenile system. Dr. Pizzat's projection of time for rehabilitation was that Christopher Behr could make notable improvement in two years and after such period no particular supervision would be necessary.

The testimony in the case sub judice is also quite unlike the testimony given in Commonwealth v. Sourbeer, supra, where the psychiatrist testified only in rough, uncertain and questionable terms on how long it would take juvenile defendant to overcome his personality disorder. The doctor who testified in Sourbeer, supra, stated that a change would

occur when the juvenile was 35 to 40 years old. id., 422 A.2d at 119-120. Clearly, Dr. Kirk was specific and definite that Christopher Behr could be rehabilitated before age 21. Dr. Pizzat recommended that juvenile petitioner undergo inpatient therapy for three to six months and outpatient therapy once a week thereafter. Dr. Pizzat emphasized that Christopher Behr must improve his self-image and develop his own identity. Dr. Pizzat, although testifying that juvenile petitioner had a moderate disorder called "over-anxious disorder," felt the juvenile petitioner could show significant improvement within two years.

Therefore, this case is distinguishable from Zoller, supra, Sourbeer, supra, Pyle, supra, and the other cases where courts refused to transfer a juvenile back to the juvenile system because there was no assurance of rehabilitation before age 21. This court is satisfied, after analyzing the testimony at the transfer hearing, that Christoper Behr has met his burden of proof on this issue and is in fact rehabilitatable prior to expiration of the juvenile court's jurisdiction.

### IV. The Nature and Circumstances of the Shooting and the Need To Protect Society

Perhaps the most critical factor this court has to consider is the nature and circumstances of the shooting, specifically; whether the safety of the community requires lengthy incarceration. This court recognizes that the manner and method of killing in this case was violent and willful, but is clearly distinguishable from those cases where courts have denied transfer of the juvenile back to the juvenile system. As will be demonstrated, the nature and circumstances of the killing in this case

are different and less gruesome than other similar cases[6] which have confronted the same issue of whether or not to transfer a juvenile defendant, charged with murder, back to the juvenile system.

In Commonwealth v. Zoller, supra, the facts indicated that: Ronald Harder was a borderline mentally retarded, 46-year-old man, who on a number of occasions during a two- to three-year period prior to the murder had homosexual experiences with the appellant, Robby Zoller. Id., 498 A.2d at 438. Harder was killed by appellant Zoller, age 15, and Fahnestock, age 15. The circumstances surrounding the killing were as follows:

"After digging a shallow grave with a shovel obtained at the Fahnestock home, and with the intent of killing Harder, appellant lured the victim to the murder site. The two beat Harder over the head with the shovel, dragged him into the grave where appellant Fahnestock, inflicted another wound. They took the victim's wallet, buried him under dirt and tree limbs, threw the shovel into a creek and washed their hands in a nearby graveyard. Id. The court in Zoller affirmed the denial of appellant Zoller's transfer request. The court in Zoller stated: "The brutal, vile nature of the murder is but one of the reasons we affirmed the judgment of sentence as to both appellants." Id. The court in Zoller, supra, ultimately based its decision to deny appellant's transfer request on the fact that there was not a sufficient guarantee that society would be protected if the juvenile appellant was transferred to the juve-

---

6. The cases that this court will analyze are the same cases used by this court to set forth the standards for determining whether to transfer the juvenile petitioner back to the juvenile system and have also been argued and briefed by both the Commonwealth and juvenile petitioner's counsel.

nile system and released at age 21. Id., see also Commonwealth v. Sourbeer, supra.

Another juvenile transfer case in which transfer was denied and upheld on appeal to the Pennsylvania Supreme Court was Commonwealth v. Romeri, supra. In Romeri, supra, the facts of the case were:

"On November 9, 1978, two boys, Joseph Romeri, age 16, and Michael Reinhard, age 17, broke into the house of an 80-year-old woman, Stella Bremmer. Appellant Romeri was Mrs. Bremmer's paperboy and neighbor. Appellant's version of what transpired in the house is that after taking a small amount of money, the two discovered Mrs. Bremmer in bed in an upstairs bedroom and that Reinhard held her down while appellant struck her with something. Reinhard's version is that after entering the house, he waited in the kitchen while appellant explored the living room and then the second floor. After hearing muffled sounds upstairs, Reinhard went up to find appellant standing with a pipe in his hand next to Mrs. Bremmer's bed, where her bloody body lay. The two ran from the house and had a snack at a local store, then returned to the house to see if Mrs. Bremmer was dead. She was not, and after covering her body with a sheet—according to Reinhard, while she continued to moan—they took more money and left the house. Mrs. Bremmer subsequently died of the beating." Id., 470 A.2d at 500. The Pennsylvania Supreme Court affirmed the decision of the Superior Court and the Court of Common Pleas, Lehigh County, which upheld the jury conviction of the juvenile defendant who was found guilty of second-degree murder, burglary, theft by unlawful taking, receiving stolen property and criminal conspiracy. Further, it is a fortiori from the decision of the Pennsylvania Supreme Court in Romeri, supra, that the

court also affirmed Judge Backenstoe's decision to deny juvenile defendant's transfer request and to treat juvenile defendant as an adult in the adult court system. Evidence indicates that at the transfer hearing, the Commonwealth produced a letter written by appellant Romeri to his girlfriend, from prison, which stated: "I have a chance of being found not guilty, that means I can get away with murder." Id. Further, evidence indicates that appellant Romeri was a poor student, an habitual truant and a continual heavy abuser of alcohol and drugs. Id., 470 A.2d at 501. Judge Backenstoe noted that the only favorable points made by defendant's attorney were the defendant's youth and the fact that defendant made a voluntary confession. Id. However, Judge Backenstoe felt that the inculpatory letter made by defendant to his girlfriend neutralized these minor positive factors. The denial of transfer by Judge Backenstoe was based on the cumulative facts that the appellant had previous contact with law enforcement agencies, his direct role in this killing and his almost complete, callous disregard of the enormity and horror of his actions. Id.

In Commonwealth v. Waters, supra, the Pennsylvania Superior Court affirmed the decision of the trial court judge which denied juvenile defendant's transfer request for placement in the juvenile system. Juvenile defendant in Waters, supra, was convicted by a jury of murder and involuntary deviate sexual intercourse. Id., 483 A.2d at 857. The facts involved in Waters, supra, were:

"On October 14, 1981, the body of an 11-year-old boy, Steven Turner, was found stabbed and bludgeoned to death in an abandoned farm house within a mile of his home in Cumberland County, Pa. The body, covered by stones and boards, was discovered in the evening as the result of a search for the boy

which commenced when he did not come home for dinner. An autopsy revealed that the 4 foot 9 inch, 80-pound sixth grader had died as the result of multiple head injuries. He had sustained a massive fracture of the skull from blows to the back and side of the head, a broken jaw on each side of the face, a stab wound to the back of the neck and a stab wound to the back of the chest. He had also been subjected to a post-mortem incise wound on the right wrist and stab wound in the front of the neck. The blade of a knife, with its handle broken off, was left in the victim's neck. The autopsy report also indicated that sperm was present in the victim's mouth."

Id. Appellant made an inculpatory statement, admitting that he had engaged in oral intercourse with the victim and then he had killed him. The court in Waters, supra, based its decision to uphold the trial court's denial of transfer on the nature and circumstances of the killing, specifically, the violent, aggressive and willful conduct displayed by the juvenile appellant, as well as the need to protect the community. Id., 483 A.2d at 858.

Turning to the nature and circumstances of the shooting in the case sub judice this court finds them to be distinguishable from those cases previously discussed. Juvenile petitioner in the present case did shoot the victim Kevin Kelly three times with a .12 gauge shotgun at close range. Testimony from those present at the scene of the crime, specifically Joseph Kenyon, age 12, and John Martell, age 15, who were friends of the victim, reflected that Kevin Kelly left a football game to go and confront Christopher Behr at the Behr residence. Kevin Kelly, as was testified to, had previously that very same day harassed Christopher Behr in the same manner

he had done in prior instances. Testimony given at the transfer hearing gave no indication to this court that Christopher Behr ever called Kevin Kelly over to his yard. Testimony is consistent that Kevin Kelly, upon seeing juvenile petitioner trimming his hedges, decided to go and confront petitioner. The other seven to eight youths followed Kevin Kelly over to the Behr's driveway in anticipation of a fight. Christopher Behr went into the house after receiving further abuse from Kevin Kelly and brought out a shotgun. Kevin Kelly told Christopher Behr to put the gun down and fight fair and then retreated off juvenile petitioner's driveway at which time he was shot by petitioner. Testimony then indicated that Christopher Behr shouted "Whose next?" and then fired two more shots into Kevin Kelly's body. Immediately following the shooting a neighbor, Inge Ennis, testified that when asked why he shot Kevin Kelly, Christopher Behr replied "I couldn't take it any more."

Accepting this testimony in the light most favorable to the Commonwealth, this court finds the killing in the case was not done in the same manner or under the same circumstances as the preceding cases. First, juvenile petitioner in this case did not commit the murder while perpetrating another crime. In the other cases previously discussed, juvenile defendants committed the murder while committing other crimes. In two instances the murders were committed in correlation with theft. (See Commonwealth v. Romeri, supra, Commonwealth v. Zoller, supra; and see also Commonwealth v. Brown, supra, which involved two youths who murdered and robbed another youth.) In another instance the juvenile committed involuntary deviate sexual intercourse in conjunction with the murder. (See Commonwealth v. Waters, supra.)

Second, this court finds that juvenile petitioner in this case failed to demonstrate the callous hardness of heart that the other juveniles possessed. In the other cases, juvenile defendants expressed no remorse for the victim. In fact, in Romeri, supra, juvenile defendants beat the woman, robbed her, left the house and got something to eat and then returned to the house to see if she was still alive. The juvenile defendant in Romeri went so far as to boast that he had a chance to get away with murder. In Zoller, supra, juvenile defendant dug a shallow grave, led the retarded, homosexual victim to the grave, beat him to death, robbed him and then buried him in the predug grave. The court in Zoller, supra, emphasized that the rationale for denying juvenile defendant's transfer request was due in part to the juvenile's lack of remorse for the victim and his "hardness of heart." Id., supra, 498 A.2d at 440. To the contrary in the present case, witnesses testified that immediately following the shooting, Christopher Behr had a withdrawn blank look on his face. Ronald Coleman testified that Christopher Behr cried over the incident and, in fact, prayed for the victim and the victim's family. All the other testimony, including that of Dr. Pizzat and Dr. Kirk, indicates to this court that not only is juvenile petitioner remorseful but also appreciates and understands the enormity and horror of the shooting. Clearly, unlike the other calloused juvenile defendants charged with murder, Christopher Behr appears to sense the irrevocable nature of his act, and the everlasting impact it shall have on everyone involved.

Third, this court notes that this killing occurred after some provocation, although insufficient provocation to in any way excuse or justify his response. Nonetheless, this was not a situation where juvenile defendant lured the victim to his grave. Nothing in-

dicates that Christopher Behr called the victim over to his house, or even wanted him there. The testimony affirmatively shows that Kevin Kelly voluntarily and willfully went over to Christopher Behr's residence to harass him, and induce him into a fight. Further, this is not a case where juvenile defendant took advantage of his victim or actively sought out his victim. As indicated in the other cases, juvenile defendants took advantage of a feeble, old victim, see Commonwealth v. Romeri, supra, a retarded victim, see Commonwealth v. Zoller, supra, and a much smaller and weaker victim, see Commonwealth v. Waters, supra. The fact is, Christopher Behr did not stalk the victim or prey on a helpless victim. Christopher Behr was the one being harassed and agitated. Although not justifying the shooting, this does differentiate the present case from the other cases previously discussed.

Fourth, juvenile petitioner in the case sub judice did not commit the killing with a codefendant. In several of the prior juvenile transfer cases juvenile defendant committed the murder in the commission of a crime and in concert with another person. See Romeri, supra, Zoller, supra, and Commonwealth v. Brown, supra.

Fifth, this court finds in juvenile petitioner's favor that his personal makeup is unlike the other juvenile defendants involved in the cases discussed prior. In those cases previously discussed, juvenile defendants were often truant from class, had poor school records, came from deprived and unsupportive family backgrounds, abused drugs and alcohol, had previous contacts with law enforcement agencies and demonstrated superior criminal sophistication. Further, they were physically mature and often associated with others engaged in criminal activity. The testimony and facts

of this case are clearly to the opposite. Christopher Behr comes from a stable and supportive family background, stable school environment and demonstrates none of the criminal sophistication possessed or demonstrated by the other juvenile defendants discussed in the previous cases.

Finally, this court finds that this case is distinguished from the other cases in that the need to protect society for a lengthy period of time, i.e., more than six years, is not substantiated in this case. Consistently, in the cases previously discussed, the courts based their decision to deny the juvenile's transfer request on the fact that there was no assurance that society would be protected if the juvenile was transferred to the juvenile system. As already demonstrated in this opinion, there has been consistent and cumulative testimony that the juvenile petitioner can be rehabilitated before age 21, in the juvenile system. Further, Dr. Pizzat specifically testified in this particular case that the need to protect society would be served if Christopher Behr was treated as a juvenile in the juvenile system. Dr. Kirk stated that although Christopher Behr has striking abnormal personality features, these psychiatric problems could certainly be treated and overcome with the proper treatment in the juvenile system. Dr. Kirk stated that his test results were that Christopher Behr gave no indication of being a recidivist. Therefore, the need to protect society in this case is not substantial as opposed to the other juvenile transfer cases in which the need to protect society was great and could not be assured with any degree of certainty.

Consequently, after analyzing the nature and circumstances surrounding the shooting and viewing the testimony in the light most favorable to the Commonwealth, this court finds that the circum-

stances surrounding the shooting are distinguishable from the other cases involving juvenile defendants charged with murder. Further, based on the testimony presented by Drs. Pizzat and Kirk, the counselors who dealt with juvenile petitioner, those who knew Christopher Behr socially, and this court's own interpretation of the incident, this court finds that the need to protect the community in this case is not a significantly overriding factor as evidenced by the certainty of the juvenile petitioner's rehabilitation and all other factors discussed herein.

### V. The Juvenile Petitioner's Amenability to Treatment in the Juvenile System

The Commonwealth argues that juvenile petitioner failed to meet his burden of proving to the court that he has a special need for treatment in the juvenile system. This court disagrees and finds that based on the unrebutted testimony presented on behalf of juvenile petitioner at the transfer hearing, Christopher Behr has demonstrated a need for juvenile treatment and further, has proved to this court that he is amenable to such treatment if placed in the juvenile system.

The court focuses initially on Dr. Kirk's testimony. Dr. Kirk testified that although he did not have a specific working knowledge of the juvenile programs in Pennsylvania, he felt that Christopher Behr could be rehabilitated in any juvenile system with the proper treatment clearly before age 21. Dr. Kirk testified that although he felt the ideal setting for Christopher Behr's treatment would be at special psychiatric juvenile facilities in Florida or Texas, Dr. Kirk was confident that even in the "non-ideal" setting Christopher Behr could be rehabilitated in

the juvenile system before age 21. Dr. Kirk did testify on cross-examination that he did not trust the adult penal system for rehabilitation. Further, Dr. Kirk testified that in his professional experience of 30 years, that juvenile petitioner would be taken advantage of and become a "chicken" in the adult system. Dr. Pizzat demonstrated to the court, through his testimony, that Christopher Behr would be devastated if placed in the adult system because he was not mature enough or strong enough to handle such placement. Dr. Pizzat testified that the juvenile system offered rehabilitation for Christopher Behr and Dr. Pizzat was very confident that Christopher Behr could be rehabilitated in the juvenile system. As previously noted in this opinion, Dr. Pizzat testified that Christopher Behr could show significant improvement in two years if placed in the juvenile system. Testimony presented by Dr. Gamble and Ronald Coleman was valuable in providing this court with an insight into Christopher Behr's adjustment to treatment in the juvenile system. Their testimony was cumulative in that Christopher Behr had adjusted well and did not display the criminal sophistication the others possessed or the sophistication necessary to survive in the adult system. Further, Ronald Coleman testified, as stated previously, that Christopher Behr got along well with others and even went so far as to console another juvenile who had been crying himself to sleep. Further, this court acknowledges that Christopher Behr is remorseful and appreciates the enormity of his actions.

Testimony from those individuals, the doctors and other character witnesses who know Christopher Behr, indicates that Christopher Behr is non-aggressive, and not mature enough to cope with adult placement. Further, based on the testimony

presented at the transfer hearing, this court is quite satisfied that the juvenile system can rehabilitate the juvenile petitioner before age 21.

This court importantly notes that the Commonwealth presented no testimony that the adult system could offer the same or similar programs as the juvenile system which would benefit the juvenile petitioner. No evidence was presented that Christopher Behr could get the proper treatment in an adult institution. The Commonwealth's testimony went to the nature and circumstances surrounding the shooting[7] and the need to protect society.

For all of these reasons, this court finds that juvenile petitioner has affirmatively met his burden in proving that he needs treatment in the juvenile system, that he is amenable to such treatment, and that he can be rehabilitated before age 21 if transferred to the juvenile system.

---

7. As has been noted previously, the seriousness of the juvenile Christopher Behr's actions cannot and should not be considered to be minimized in any way by the favorable aspects this court has found in his character pursuant to this opinion. Surely there is something sorely lacking in defendant's makeup, and possibly even in our society (perhaps, as Dr. Kirk suggested in his testimony, it has to do with all of the violence children are exposed to on television and at the movies) when a seemingly normal 15-year-old boy takes a loaded shotgun and at close range, uses it on one of his peers, not once but three times. No amount of remorse or rehabilitation on the part of Christopher Behr can ever give back to the Kelly family what they have irretrievably lost, a son, just beginning to grow into manhood. Without a doubt, their family has been torn asunder and their lives will never be the same. The court can only try to imagine the depth of their grief, and all of this because of a senseless act of fatal violence by a 15-year-old neighbor boy, Christopher Michael Behr.

## CONCLUSION

Wherefore, after considering the testimony presented at the transfer hearing, after reading the briefs on behalf of both the juvenile petitioner and the Commonwealth and after applying the relevant law to the facts of this case, specifically, the criteria enunciated in 42 Pa.C.S. §6355(a)(4)(iii)(A) and the case law developed in Commonwealth v. Pyle, supra, and its progeny of cases, this court finds that Christopher Michael Behr is to be transferred to the juvenile system for treatment as a juvenile.

## ORDER

And now, this March 20, 1987, after testimony and submission of briefs by counsel, it is hereby ordered, adjudged and decreed that Christopher Michael Behr be transferred to the jurisdiction of juvenile court for treatment as a juvenile within the juvenile system.